******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# CINDY WATSON *v.* ZONING BOARD OF APPEALS OF THE TOWN OF GLASTONBURY
## (AC 41209)

DiPentima, C. J., and Bright and Beach, Js.

*Syllabus*

The plaintiff appealed to the trial court from the decision by the defendant zoning board of appeals affirming the decision of the defendant zoning enforcement officer, declining to approve the plaintiff's application for permission to conduct a customary home occupation from a home office within her residence. The plaintiff owns and operates a business providing special transportation services off-site to school districts, and she manages the business from a home office in her residence where she and another employee use computers and make phone calls. Following a complaint, the zoning enforcement officer issued a cease and desist order to the plaintiff, from which she appealed to the board, which agreed to table the matter. Thereafter, the plaintiff filed her application for permission to conduct a customary home occupation, which was also denied, and the board denied the plaintiff's appeal therefrom. The trial court subsequently rendered judgment dismissing the plaintiff's appeal from the board's decision, from which the plaintiff, on the granting of certification, appealed to this court. *Held*:

1. The trial court erred in concluding that the plaintiff needed to prove that her home occupation was customary, in that other people in her town also were managing off-site companies from their home offices, in addition to establishing that she complied with the specific standards set forth in the town building zone regulations; the management of a business from a single room home office, within a person's primary residence, that complies with the specific standards of the regulations, is a customary home occupation that is customarily incidental and subordinate to the actual principal use of the property, the town set forth very specific factors to be employed in its determination of whether an accessory use, in the form of a customary home occupation, is permitted in a residential zone, and there was no separate and distinct test that an applicant must meet in order to satisfy the word "customary."

2. The trial court erred in concluding that the board acted reasonably in denying the plaintiff's application simply because her home occupation was part of a larger business that took place off-site; pursuant to the applicable regulation, the occupation being conducted at the residence must take place either inside of the residence or in an enclosed approved accessory building on the premises, there was nothing in the plain language of the regulation that prohibits a home occupation that is part of a larger enterprise located off-site, it was undisputed that the plaintiff's application contemplated that her entire home occupation would take place within her dwelling and not outside on her property, and, therefore, the board had no evidence on which to deny her application for failing to comply with the regulations.

Argued January 7—officially released April 23, 2019

*Procedural History*

Appeal from the decision of the defendant affirming the decision of the defendant's zoning enforcement officer declining to approve the plaintiff's application for permission to conduct a customary home occupation from a home office within her residence, brought to the Superior Court in the judicial district of Hartford, where the court, *Robaina, J.*, granted the plaintiff's motion to cite in the defendant Peter R. Carey; thereafter, the matter was tried to the court, *Domnarski, J.*; judgment dismissing the appeal, from which the plaintiff, on the granting of certification, appealed to this

court. *Reversed; judgment directed.*

*Kenneth R. Slater, Jr.*, for the appellant (plaintiff).

*Andrea L. Gomes*, with whom was *Matthew Ranelli*, for the appellees (defendants).

*Opinion*

BRIGHT, J. The plaintiff, Cindy Watson, appeals from the judgment of the Superior Court dismissing her appeal from the decision of the defendant Zoning Board of Appeals of the Town of Glastonbury (board), in which the board affirmed the decision of the defendant zoning enforcement officer, Peter R. Carey, declining to approve the plaintiff's application for permission to conduct a customary home occupation from a home office within her residence. On appeal, the plaintiff claims that the Superior Court erred in upholding the decision of the board and dismissing her appeal because the court improperly concluded that (1) the plaintiff needed to prove that her home occupation was "customary," in that other people in Glastonbury also were managing off-site companies from a home office, in addition to establishing that it complied with the specific standards set forth in § 7.1 (b) (2) (a) of the Glastonbury Building Zone Regulations (regulations), and (2) the determining factor of whether a specific customary home occupation is allowed under the regulations is by a consideration of the nature of the business to which the home occupation relates and whether any part of that business is conducted off-site. We reverse the judgment of the Superior Court.

The record reveals the following uncontested facts. The plaintiff owns and operates a business, Haven Transportation, LLC (business), which provides special transportation services to school districts, using minivans. The business has forty-one vehicles and forty-nine employees, and it operates a facility in East Hartford, which has an office and a maintenance facility. Many of the business' minivans are stored at this location or at the homes of the employees who drive them.

The plaintiff has managed her business from her residence since 2013, in a single room home office. Prior to November, 2015, drivers using the minivans went to the plaintiff's residence, both for business and for social events. Following a complaint, Carey, on November 18, 2015, issued a cease and desist order to the plaintiff. The order alleged that the plaintiff was operating her business outside of the regulations in that (1) a transportation center was not a permitted use, (2) the plaintiff had not obtained the town's approval for a customary home occupation, and (3) the plaintiff was storing as many as eight commercial vehicles at her residence.

On December 7, 2015, the plaintiff filed an appeal of the cease and desist order with the board. She attached a statement of her reasons for appeal, which set forth, in relevant part: "The [plaintiff] . . . operates a fully compliant customary home occupation in which she manages, by telephone and electronic communications, the logistics of her business, which provides transportation services to students, primarily those with special

needs, using vehicles that are the primary vehicles used by [the plaintiff] and her husband, and a third vehicle, such as a passenger van, that is periodically used for the business. . . . As will be demonstrated at the hearing before the [board], the [plaintiff's] home occupation at the [p]roperty is a secondary use to her family's primary residence and meets all conditions for operating a customary home occupation under the [regulations]."

During the January 4, 2016 public hearing on the plaintiff's appeal from the cease and desist order, her attorney, Kenneth R. Slater, explained that the plaintiff had hired him one month before the cease and desist order was issued, and that the plaintiff was compliant with all regulations by the time that order was issued. Additionally, following discussions with several members of the board during the hearing, Slater agreed that the plaintiff would file an application for permission to conduct a customary home occupation. He explained that they had not filed previously because the application process was unclear.[1] Carey told the board that he would need more information in the form of an application before he could make a decision regarding the merits of such an application. The minutes of this hearing also reflect that Carey told the board that he had issued the cease and desist order because he had been instructed to do so "by a higher-up." The board unanimously agreed to table the matter.[2]

Thereafter, on January 8, 2016, the plaintiff submitted her application for permission to conduct a customary home occupation. On January 25, 2016, Carey sent a letter to the plaintiff and her attorney notifying them that he had denied the plaintiff's application, stating, in relevant part: "[Y]ou do not meet the general intent and spirit of the [c]ustomary [h]ome [o]ccupation [regulations], and also don't meet all the standards set forth in [§ 7.1 (b) (2) (a) of the regulations], specifically items 1, 4, and 8. . . . Items 1 and 4 are based on evidence from complaints and testimony and also from your letter dated [January 8, 2016]. The operation of the home occupation doesn't take place entirely within the home, and has changed the character of the neighborhood. Given past practice, it is apparent that Haven Transport vehicles come and go from the property. . . . Item 8 is based on complaints and testimony of past practices. There is evidence that unsightly conditions of the property have existed and will possibly continue in the future. Therefore I am continuing to uphold my cease [and] desist dated November 18, 2015 and [d]eny your application for a [c]ustomary [h]ome [o]ccupation . . . ." (Emphasis omitted.) The plaintiff appealed that denial to the board.

On April 4, 2016, the board conducted what appears to have been a rather contentious hearing on the plaintiff's appeal. During the hearing, in response to some com-

ments by board members, Slater explained to the board that it was required to conduct a de novo review of the plaintiff's application, rather than merely review the determination of Carey. He then began his presentation to the board. Board chairperson, Timothy Lamb, asked if the business was still being operated out of the residence, and Slater explained that the call center was ongoing, using phones and a computer. Lamb stated that the plaintiff was applying for permission to do something that she already was doing, and that she was acting ahead of her application. Board vice chairperson, Sandra O'Leary, stated that because Carey already had denied the plaintiff's application for permission to have a customary home occupation, she did not understand why the board needed "to go through all of this again." O'Leary also indicated that she had a problem with the plaintiff's operation of the business without the town's permission. Slater stated that the purpose of the hearing was to obtain the town's permission.

Slater proceeded to introduce evidence, but some members of the board appeared frustrated by his presentation, making comments such as "we agree . . . that's [the plaintiff's] home office and that's fine. I mean you don't have to swear on a stack of Bibles," and "what's the point?"[3] Slater attempted to explain that he was trying to show that the plaintiff was in compliance with the regulations regarding customary home occupations. Lamb stated that the board knew that the plaintiff had a home office, and that she had employees who came to visit. Slater disagreed with that, and said there was no evidence that employees were visiting the home office any longer. The plaintiff then explained to the board that she had only one employee who came to her home office, and that this person actually works in the home office. She denied that any other employees or applicants for employment come to her home office, or that she conducts meetings at her home office. Slater further explained that the plaintiff allows some employees to take the company vehicles home with them, and that some people who work for the plaintiff's business visit her at home in a personal capacity, not for business. Slater then explained that the plaintiff has asked that they no longer use company vehicles for such visits.

Slater stated to the board that the plaintiff has brought her home office into compliance with the regulations and that the presentation to the board was meant to demonstrate "that this business as it's being conducted right now is nothing more than two people in a room making phone calls and [that] one commercial vehicle [which the plaintiff drives on occasion is] being parked [there]. If [the vehicle is] there for longer than driving in and out by [the plaintiff], it is stored in the rear as required by the regulations." Vice Chairperson O'Leary interrupted Slater's presentation and stated, in relevant part: "Well, you know what? It's time for these people to move out. It's not fair for neighbors to see

this type of thing. And you know what? There's probably a lot more going on than you're telling us, which I'm— you know, I know it's probably not right for me to say that to you but that's how I feel. We're not attorneys here. You know, we're just volunteers to this [b]oard elected. We try to do a good job for people and try to make everybody happy and make the town good. And I think really it's about time that she realizes that it's just not a good situation to be in in her house." Slater attempted to explain that "the situation is [that the plaintiff] and one woman answer phones and operate—" but O'Leary interrupted and said she had "a hard time believing that." When Slater then asked the board to listen to the evidence, O'Leary responded that Slater should "move it along, because  .  .  .  this is not a court case."

Members of the board then expressed concern to Slater that the plaintiff was operating her home office before getting approval from the town. Slater explained that they were unclear about the regulations and that they had agreed during the January 4, 2016 hearing that they would submit an application for approval of the home office. Additionally, he stated that no one had suggested during that hearing that the plaintiff stop her livelihood during the application process. He also stated: "We said we were going to apply to show that we were in conformance, and we believe we've done that, and we believe the evidence will show that."

Alternate board member, Ed Andreozzi, then stated: "Correct me if I'm wrong, but I thought we [had] decided that they would remove their [appeal]  .  .  .  they would reapply to [Carey], he would make a decision based on the new information, based on what we told them they had to do to change their business. They would change their business, reapply under the new standards. Then [Carey] would decide if that was okay or not, and if it was okay, he would give them a pass; if it was not okay, they would be back before us." Lamb stated that was not correct, but others, including Slater, the plaintiff, Andreozzi, and O'Leary stated that Andreozzi was correct. Andreozzi then stated that he believed the board had an obligation to hear Slater and to "make a decision based on what's happening today with the business, not what happened six months ago."

After further discussion with board members, Slater went through all of the requirements set forth in the regulations for a customary home occupation and explained how the plaintiff's office met each one. Slater then questioned one of the road supervisors for the plaintiff's business, Joseph Frederick. Frederick spoke about the business and how it operates. He spoke about the main office in East Hartford, the parking of vehicles, and that the employees had been instructed not to go to the plaintiff's home. He explained that once the plaintiff knew about what she needed to do to comply with the

regulations, they immediately put things into place to ensure compliance.

Slater also questioned Teraya Broaden, the employee who works in the plaintiff's home office. Broaden indicated that no other employees or potential employees come to the plaintiff's residence. She also indicated that, although she occasionally drives a work minivan, she no longer brings that vehicle to the plaintiff's residence.

The board asked if anyone wanted to speak to the appeal, and one neighbor, Kevin Borsotti, spoke. He stated that his primary concern was the safety of his children. Although he admitted that the plaintiff had been in compliance with the regulations since the prior issuance of the cease and desist order, he remained concerned and thought that the plaintiff's prior actions should be taken into consideration by the board. The board then noted that another neighbor, Michael W. Gilmartin, and his wife, Grace C. Gilmartin, had sent a letter in opposition to the plaintiff's appeal. The letter alleged that the plaintiff was conducting maintenance, overnight parking and dispatch of vehicles, employee interviews, hiring, and employee meetings at her residence. Slater contested the allegations in the letter and told the board that it had heard evidence at the hearing that those things were not being done at the residence and that the plaintiff had a separate facility for those things.

The board then asked some questions, including asking Carey whether he could issue another cease and desist order if they granted the plaintiff's appeal and she thereafter failed to comply with the regulations, which Carey assured them that he could do. As for the specific reasons that Carey cited in his denial of the plaintiff's application, an unnamed board member asked him about the regulation that requires that the "customary home occupation shall be carried on entirely within the dwelling unit or within a completely enclosed permitted accessory business on the same lot as the dwelling." Carey explained that he had always interpreted that to mean that the entire business was operated in one location, that it is "not a small piece of a larger entity." He further explained that his conclusion that the plaintiff's business did not comply with the regulations because it changed the residential character of the neighborhood was based on the manner in which the plaintiff operated the business.[4]

After Lamb closed the public hearing portion of the meeting, board member and secretary, Michael Fitzpatrick, offered a motion to deny the plaintiff's appeal, which was seconded by O'Leary. Alternate board member Robyn Guimont stated for the record that she believed that the plaintiff established that she is in compliance with the regulations and that the board should consider approving her appeal. Board member Nicholas

Korns also stated that he believed the plaintiff was in compliance. He urged the board to look at the current state of facts and not to rely on the occurrences from six month ago.

Lamb stated that "a residential neighborhood is not appropriate for a commercial enterprise." He also stated that it was "unfortunate" that there were not as many people present as had been present previously. He opined that "there was a lot of evidence presented that, going forward, it appears that [the plaintiff] may be in compliance. . . . I've had a business, and, you know, I have moved out of my house. You gotta move, you gotta move. I mean, it's good that she's developed a great business, but there comes a time where a residential neighborhood is not the place for a commercial business. And I feel that it's just created a toxic environment in the neighborhood . . . I'm just not—I'm not going to be in favor of it."

Korns reminded the board that the regulations allow for a commercial business to be operated in a residential zone, and he, again, opined that the plaintiff was in compliance with the regulations. He also stated that he disagreed with Carey's statement that the business must be wholly contained in the home office. Lamb acknowledge Korns' statement and agreed that the regulations allow for a commercial business, but he stated that he did not credit the testimony that employees no longer go to the plaintiff's residence and stated that "to [him], it's still a commercial business that's being run in the neighborhood."

Fitzpatrick stated that he was "going to put [his] faith in [Carey] as far as the entirety of the business." He further stated: "I think most of these businesses from what the philosophy of the office is that the building code is that it's a small business, but if it gets beyond that, then you got to move on." Fitzpatrick also voiced concern that the plaintiff did not show global positioning system (GPS) updates to prove no business vehicles had been to her residence.[5] He stated that he would be voting to uphold the decision of Carey for those reasons.

O'Leary stated: "Okay. I would just like to say one thing, that I'm not in favor of it, and the reason that I'm not in favor of it is because if you look at [the regulations], I do believe a customary home occupation shall not change the residential character of such dwelling, unit and lot. And it definitely has changed the neighborhood drastically. So—and I'm not going to get into who changed it, it's just changed. And so therefore I'm not in favor of it."

Andreozzi then stated: "So I guess I'll just add to that, I am not voting tonight but if I were, I would vote in favor of this.[6] It sounds like we have enough votes to deny this application, which I think is unfortunate. I

think that they've made an effort to show they have been compliant tonight, and I think they made a successful effort. You know, we saw no evidence of nonconformity tonight. We had one person actually speak and whether knowingly or not spoke in favor, you know, saying that there was no nonconformity that they were aware of and, you know, I think that in the absence of not having any new evidence over the last several months that they are doing something incorrectly I don't see how you vote against this.

"I don't believe it's a commercial enterprise. I think those are the wrong words to use when it's two people in a room answering phones. I mean there's plenty of people that work on their computer and then have their nanny over, you know, if that's the situation. So I don't see the problem.

"You know, there's two sides you can error on this. You can vote to shut it down and you're probably permanently shutting down somebody's small business or significantly making it change or moving or making it more expensive or more difficult to operate. Or you can vote for it and we still have [Carey] and his department to monitor the situation and make sure that there is no, you know, falling out of favor with what they're supposed to be doing. So I just leave it at that. I would vote— you know, I would not vote in favor of shutting down somebody's business when we have time to show conformity." (Footnote added.)

Because of some confusion about the negative motion that Fitzpatrick had made, he, thereafter, amended his motion to approve the appeal of the plaintiff. Korns seconded the modified motion. Following more confusion over what a yes vote meant, the board voted two to three against granting the plaintiff's appeal, with Korns and Guimont voting to grant the appeal, and Lamb, O'Leary, and Fitzpatrick voting to deny the appeal. Andreozzi could not vote because he had the nonvoting role of an alternate at the meeting. The board did not set forth a collective statement of the reasons for upholding the denial of the plaintiff's application. On April 7, 2016, the board provided public notice of its decision denying the plaintiff's appeal by publication in the Glastonbury Citizen newspaper by means of a simple denial. Pursuant to General Statutes § 8-8 (b), the plaintiff, thereafter, appealed from the board's decision to the Superior Court.

The Superior Court, after searching the record for the basis of the board's decision, concluded that the board improperly relied on past events, but that it, nonetheless, properly denied the plaintiff's appeal. The court reasoned that (1) the plaintiff's business was not "customary" because there was no proof that other residents of Glastonbury also managed off-site companies from their residential home offices, and (2) the plaintiff's home occupation did not comply with § 7.1 (b) (2) (a)

(1) of the regulations because it was part of a larger enterprise that occurred off-site. This appeal followed.

On appeal, the plaintiff claims that the court erred in upholding the board's decision. Specifically, she claims that the court improperly concluded that (1) the plaintiff needed to prove that her home occupation was "customary," in that other people in Glastonbury also were managing off-site companies from their home office, and (2) the determining factor of whether a specific customary home occupation is allowed under the regulations is by a consideration of the nature of the business to which the home occupation relates and whether any part of that business is conducted off-site. After setting forth our standard of review, we will address each of the plaintiff's claims in turn.

"A zoning enforcement officer acting on an application for a zoning permit has a purely ministerial function. . . . If the application conforms to the requirements of the regulations, he has no discretion but to issue a permit." (Citations omitted.) *Maluccio* v. *Zoning Board of Appeals*, 174 Conn. App. 750, 756, 166 A.3d 69 (2017).

"[F]ollowing an appeal from the action of a zoning enforcement officer to a zoning board of appeals, a court reviewing the decision of the zoning board of appeals must focus, not on the decision of the zoning enforcement officer, but on the decision of the board and the record before the board. . . . [T]he zoning board of appeals makes a de novo determination of the issue before it, without deference to the actions of the zoning enforcement officer. . . .

"[T]he board is endowed with liberal discretion and . . . its actions are subject to review by the courts only to determine whether they are unreasonable, arbitrary or illegal. . . . The burden of proof to demonstrate that the board acted improperly is upon the party seeking to overturn the board's decision. . . . It is the board's responsibility, pursuant to the statutorily required hearing, to find the facts and to apply the pertinent zoning regulations to those facts. . . . Upon an appeal from the board, the court must focus on the decision of the board and the record before it. . . .

"In reviewing a decision of a zoning board, a reviewing court is bound by the substantial evidence rule, according to which, [c]onclusions reached by [the board] must be upheld by the trial court if they are reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the [board]. . . . The question is not whether the trial court would have reached the same conclusion, but whether the record before the [board] supports the decision reached. . . . If the trial court finds that there is substantial evidence to support a zoning board's findings,

it cannot substitute its judgment for that of the board. . . . If there is conflicting evidence in support of the zoning [board's] stated rationale, the reviewing court . . . cannot substitute its judgment as to the weight of the evidence for that of the commission. . . . The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Woodbury Donuts, LLC* v. *Zoning Board of Appeals*, 139 Conn. App. 748, 757–60, 57 A.3d 810 (2012). Where, as here, the board does not state formally the reasons for its decision, "the trial court must search the record for a basis for the board's decision." (Internal quotation marks omitted.) *Moon* v. *Zoning Board of Appeals*, 291 Conn. 16, 25, 966 A.2d 722 (2009).

When applying the specific regulations of a town, "[g]enerally, it is the function of a zoning board or commission to decide within prescribed limits and consistent with the exercise of [its] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply. The [Superior Court must] decide whether the board correctly interpreted the section [of the regulations] and applied it with reasonable discretion to the facts. . . .

"A local board or commission is in the most advantageous position to interpret its own regulations and apply them to the situations before it. . . . Although the position of the municipal land use agency is entitled to some deference . . . the interpretation of provisions [of a municipal zoning regulation] is nevertheless a question of law for the court. . . . The court is not bound by the legal interpretation of the [regulation] by the [board]." (Internal quotation marks omitted.) *Lowney* v. *Zoning Board of Appeals*, 144 Conn. App. 224, 228–29, 71 A.3d 670 (2013).

I

The plaintiff claims that the court erred in concluding that she needed to prove that her home occupation was "customary," in that other people in Glastonbury also were managing off-site companies from their home offices, in addition to establishing that she complied with the specific standards set forth in the regulations. She argues that Glastonbury has adopted specific standards in its regulations that govern the location, size, nature of the use, parking, and signage for customary home occupations, and that it has chosen not to list specific authorized home occupations. She contends, therefore, that any home occupation, using a home office, which meets all of the standards, necessarily qualifies as a customary home occupation. Otherwise, she argues, "customary" would be determined on a case-by-case basis with no relationship to the regulations. This would give a zoning enforcement officer

(officer) unfettered discretion to deny an application or to issue a cease and desist order to any resident who has a home occupation that fully complies with every regulation, but who, nevertheless, has a home occupation that the officer thinks is a bit unusual or involves new technology, despite the fact that it has no impact on the residential character of the neighborhood and complies with the specific standards set forth in the regulations. She further argues, however, that even if "customary" is something outside of the strict requirements of § 7.1 (b) (2) (a), her home office is customary in that she uses only computers and telephones to manage her business from a single office in her residence.

The board argues that the plaintiff was required to prove that her home occupation was customary, and, in this case, that meant that she needed to prove, specifically, that managing a transportation company is a customary residential home occupation in Glastonbury. It further argues: "Contrary to [the] plaintiff's assertion, and as held by the [Superior Court], the regulations specify that, in addition to satisfying the twelve performance standards in [§] 7.1 (b) (2) (a) [of the regulations], the plaintiff must also satisfy the definition of customary 'home occupation' in [§] 2.22: 'Home Occupation—A use, not otherwise permitted in the zone, which is customarily and may properly be conducted for compensation as an accessory use on a residential lot (See [§] 7).' . . . The definition of 'home occupation' requires that the use be 'customarily' and 'properly' conducted in a home as an accessory use. An accessory use must also be a use 'customarily incidental and subordinate to the actual principal use . . . .' " (Citation omitted.)

After thoroughly reviewing the regulations at issue, and fully considering the briefs and arguments of the parties, we conclude that the management of a business from a single room home office, within a person's primary residence, that complies with each of the specific standards set forth in § 7, is a customary home occupation that is customarily incidental and subordinate to the actual principal use of the property as a primary residence under the regulations.

"The phrase used in most zoning regulations is that [an accessory] use must be 'customarily incidental to'— not that the use must be 'customary.' If the rule intended that only customary uses could come under the doctrine, then many or most people in the area would have to be doing the same thing before any one of them could (unless they asked government permission first). . . . [W]e would still have horse stables instead of garages in our residential neighborhoods; someone has to be first if a use is ever to become customary." T. Tondro, Connecticut Land Use Regulation (2d Ed. 1992) p. 85. "Several factors . . . are weighed when making an accessory use decision. The relative scale of the acces-

sory use and its usual relationship to the primary use of the property must be considered. Ultimately the decision comes down to balancing an owner's right to use his land for more than simply providing food and shelter, against the neighbors' expectations of what will happen in their neighborhood and the degree of impact the accessory use will have on the neighbors' right to use their land." (Footnote omitted.) Id., 87–88.

"A decision to deny . . . administrative review applications, or to subject them to conditions . . . must be based on sufficiently specific authority in the regulations to support a conclusion that the decision made is in accordance with the policies established by the legislatively acting commission that established the policy in the first place. Much of the litigation over the approval of one of these applications turns on the degree of specificity required in the governing regulations. . . .

"The requirement that standards be published prior to an agency's action applies even if the agency authorized to grant the administrative approval is the municipal legislative body . . . . [I]t is the function performed rather than the source of power of the board that requires that the board act pursuant to standards. The standards are meant to guide the agency's decisions; it must consider the factors listed in the regulations when making its decision, and only those factors. Moreover, if these standards are satisfied, the permit must be issued. The commission acts in an administrative capacity when issuing an administrative approval, and administrative agencies do not have the discretion to deny an application that satisfies all the criteria established by the legislative body for commission action. This is simply another way of saying that an administrative agency can only base its decisions on criteria in its published regulations." (Footnotes omitted; internal quotation marks omitted.) Id., 188–91.

In the present case, § 2.2 of the regulations defines accessory use as: "A use of land or a portion of a structure or building customarily incidental and subordinate to the actual principal use of the land, structure or building and located on the same lot with such principal use, structure or building."

Section 2.22 of the regulations defines a home occupation as: "A use, not otherwise permitted in the zone, which is customarily and may properly be conducted for compensation as an accessory use on a residential lot (See [§] 7)."

The plaintiff's residence is located in the town's residential zone A, which is governed by § 4.5 of the regulations. Section 4.5.2 lists the permitted accessory uses in the A zone. Customary home occupation is listed as an accessory use, subject to the provisions set forth in § 7.0 of the regulations.

Section 7.1 of the regulations provides in relevant part: "Accessory uses and structures associated with residential uses located in the residence zones or on lots in non-residence zones on which permitted or non-conforming residential uses are situated shall be subject to the condition that no such use or structure shall [involve] the conduct of a business or sale of a project, or a service, except a home occupation, a boarding, rooming or lodging house or a roadside stand, all as hereinafter limited, and to the following conditions:

"a. Customary Accessory Uses and Structures

"1. Permitted customary accessory uses and structures. Customary accessory uses and structures are permitted in the residence zones and on lots on non-residential zones on which permitted or non-conforming residential uses are situated, and may include but are not limited to: dog house, greenhouse, tool shed or storage building, children's playhouse, tennis court, laundry room, hobby room or mechanical room, playground or recreation area, and garden. . . .

"b. Special Accessory Uses and Structures

"1. Permitted special accessory uses and structures. Special accessory uses and structures are permitted in the residence zones and on lots in non-residence zones on which permitted . . . non-conforming residential uses are situated as set forth in Section 4 of these Regulations and shall be subject to such additional conditions as are set forth herein. Special accessory uses and structures shall include: customary home occupation, garage or carport and the parking of a commercial vehicle, the parking or storage of a boat, trailer or mobile home, guest house, bathing or swimming pool and bath house, roadside stand, the stabling of horses (and) the keeping and housing of livestock or poultry for domestic purposes on, and traditional professional medical/dental care facility. . . .

"2. Conditions for special accessory uses and structures. In addition, the requirements for height, location and maximum land area for customary accessory uses and structures, special accessory uses and structures shall be subject to the following conditions:

"(a.) Customary home occupation. A customary home occupation shall be subject to the following provisions:

"1. A customary home occupation shall be carried on entirely within the dwelling unit or within a completely enclosed permitted accessory building on the same lot as the dwelling unit.

"2. A customary home occupation shall be carried on by the inhabitants of such dwelling unit and shall involve the employment on the premises of only any member of the immediate family residing in such dwelling unit plus one person, full or part time, not residing

in such dwelling unit.

"3. A customary home occupation shall be clearly incidental and secondary to the use of such dwelling unit and lot for residential purposes.

"4. A customary home occupation shall not change the residential character of such dwelling unit and lot.

"5. A customary home occupation, whether contained in a dwelling unit or in an accessory building, shall occupy an area not to exceed twenty-five percent (25%) of the gross floor area of such dwelling unit.

"6. A customary home occupation shall not offer, display or advertise any commodity or service for sale or rental on the premises.

"7. A customary home occupation shall not store any materials or products on the premises outside of the dwelling unit or the permitted accessory building in which it is located.

"8. A customary home occupation shall not create any objectionable noise, odor, vibrations or unsightly conditions.

"9. A customary home occupation shall not create a health or safety hazard.

"10. A customary home occupation shall not create interference with radio and television reception in the vicinity.

"11. Signs associated with customary home occupation shall be limited to one identification sign per dwelling unit, such sign not to exceed [more] than two (2) square feet in area.

"12. The Building Official may, at his discretion, for good cause such as a non-customary use, potential excessive noise, storage of materials or parking, [refer] any question concerning a customary home occupation to the Town Plan and Zoning Commission for its review and recommendations. The Town Plan and Zoning Commission shall have thirty (30) days from its receipt of the application from the Building Official within which to forward its report of findings and recommendations to the Building Official. Said report of the Town Plan and Zoning Commission shall be advisory only, and the failure of the Town Plan and Zoning Commission to submit its report within the prescribed thirty (30) day period shall not prevent the Building Official from reaching a decision on the application for the customary home occupation after the prescribed thirty (30) day time period has expired."

Section 9.0 of the regulations concerns parking. Section 9.11 (a) specifically addresses parking for customary home occupations: "The following off-street parking standards are minimum requirements for off-street parking and the Town Plan and Zoning Commission may require additional off-street parking for a particular

development based on the nature of the development, its location, access and relation to surrounding development, and any unique parking demand which may be associated with such a development. . . .

"a. Customary home occupation: One (1) parking space for each employee plus two (2) parking spaces, such parking spaces to be in addition to any required off-street parking for residential purposes."

The plaintiff contends that a review of the regulations reveals that a "customary home occupation" is one that complies with § 7.1 (b) (2) (a) of the regulations. She argues that requiring her to prove a standard of "customary" that is not set forth in the regulations is improper, especially in light of the specificity of the standards set forth in the regulations regarding customary home occupations. She further argues, however, that even if the word "customary" in the regulations is meant to convey something beyond the specific requirements of § 7.1 (b) (2) (a), her home occupation is customary in that she uses only a computer and telephones to manage her business from a single office in her primary residence. We conclude that a home occupation that satisfies the specific standards set forth in § 7.1 (b) (2) (a) is a customary home occupation under the regulations; there is no separate and distinct test that an applicant must meet in order to satisfy the word "customary." Rather, if an applicant meets the standards, the home occupation is customary under the regulations as adopted by the town of Glastonbury.

"There have always been some who worked in their homes, but there are many more now with the advent of the personal computer and 'telecommuting.' " 6 E. Yokley, Zoning Law and Practice (4th Ed. 2013) § 44-5, p. 44-27. "[P]ublic interference with a person's hobbies, or with his [or her] preference to work at home, raises sensitive issues on the nature of freedom, in a quite different way from the familiar situation where a businessperson or developer complains that zoning restrictions have abridged his or her freedom to make more money from land." 4 N. Williams, Jr. & J. Taylor, American Land Planning Law (Rev. Ed. 2018) § 79:1. "The principal problem with [accessory uses] is . . . their impact on the residential area nearby—primarily in the traditional terms of the common-law nuisances but also in terms of various other objectionable factors with which residential zoning is normally concerned. . . . Various activities and/or structures may affect the appearance of the neighborhood . . . . The factors found objectionable are sometimes more spiritual in nature . . . . [M]any of these secondary activities, and particularly the non-income-producing ones, involve rights of a personal sort, and such rights involve considerations which are quite different from those involved in the usual cases where a developer wishes to use land for some more profitable activity." Id., § 79:5.

In the present case, the Superior Court concluded that the board properly determined that a home occupation had to be "customary" in the town, and that the establishment of what is "customary" is an additional requirement over and above all of the specific standards set forth in the regulations. Specifically, the court held that "the plaintiff had the burden to establish that home occupations similar to hers are in fact customarily conducted in the zoning district in which the subject property is located. . . . The plaintiff did not present evidence to establish that such activities, related to managing an off-site business, *are actually and customarily* performed at other homes in Glastonbury." (Citation omitted; emphasis in original.) We disagree that the regulations contain such a requirement.

Section 2.2 of the regulations defines an accessory use, in relevant part, as "[a] use of . . . a portion of a structure . . . customarily incidental and subordinate to the actual principal use of the . . . structure . . . ." Section 2.22 of the regulations defines a home occupation, in relevant part, as "[a] use, not otherwise permitted in the zone, which is customarily . . . conducted for compensation as an accessory use on a residential lot . . . ." Section 2.22 then specifically directs the reader to § 7.0 of the regulations. Section 4.5.2 of the regulations sets forth the permitted accessory uses in the town's A residential zone. Customary home occupation is listed as an accessory use, *subject to the provisions set forth in § 7.0 of the regulations.*

Section 7.1 (b) (1) of the regulations specifically allows "[s]pecial accessory uses and structures," specifically including a "customary home occupation . . . ." The specific standards for an acceptable customary home occupation then are set forth in § 7.1 (b) (2) (a), and the parking requirements are set forth in § 9.0 of the regulations.

There is no definition of the word "customary" set forth in the regulations that might indicate that an applicant must comply with something more than the very specific requirements set forth in § 7.1 (b) (2) (a) of the regulations. Rather, the regulations are quite specific and detailed on what requirements an applicant must meet for his or her customary home occupation to be compliant. Although we readily agree with the court and the board that the regulations require that the accessory use be "customarily incidental and subordinate to the actual principal use"; Glastonbury Building Zone Regs., § 2.2; we conclude that, in this case, the factors that are relevant to this determination are set forth with specificity in § 7.1 (b) (2) (a) of the regulations.

To support its argument that the plaintiff must establish that her specific business, namely, the management of an off-site transportation company, must be "custom-

ary" in her zone, the board relies in large part on *Lawrence* v. *Zoning Board of Appeals*, 158 Conn. 509, 264 A.2d 552 (1969). In *Lawrence*, the plaintiff sought to keep goats and chickens at his residence, which was located in the residence and agriculture district in North Branford. Id., 510–11. The keeping of goats and chickens, however, was not a principal or accessory use under the regulations. Id., 511. The plaintiff, nevertheless, argued that it was an accessory use. Id. The North Branford zoning ordinance defined an accessory use as "[o]ne which is subordinate and customarily incidental to the main building and use of the same lot." (Internal quotation marks omitted.) Id., 510 n.1. Our Supreme Court explained that the crucial phrase in the regulations at issue was the phrase "customarily incidental," which defined the meaning of an accessory use. (Internal quotation marks omitted.) Id., 511. The court determined that an accessory use must be incidental to the primary use; id., 511–12; and that it must be "usual to maintain the use in question in connection with the primary use of the land." Id., 512. The court concluded that to determine what is "customarily incidental," certain factors must be examined, such as the size of the lot, the nature of the primary use, the use made of the adjacent lots by the neighbors, and the economic structure of the area. (Internal quotation marks omitted.) Id., 511, 513.

We are not persuaded that *Lawrence* is helpful to our analysis. The court in *Lawrence* noted that the analysis it undertook is required "[i]n situations where there is no . . . specific provision in the ordinance . . . ." (Internal quotation marks omitted.) Id., 513. The ordinance at issue in *Lawrence* only defined accessory uses generally, without identifying specific criteria to consider when determining whether a use complies with the ordinance. See id., 510 n.1. By contrast, in the present case, the town has set forth very specific factors to be employed in its determination of whether an accessory use, in the form of a customary home occupation, is permitted in a residential zone. Unlike in *Lawrence*, there is no need, in the present case, to employ our own factors or anything beyond that which is set forth in the regulations; the regulations, themselves, employ the factors that the town concluded were necessary to its determination. Accordingly, we conclude that a home occupation that satisfies the specific standards set forth in § 7.1 (b) (2) (a) of the regulations is a customary home occupation, and there is no separate and distinct test that an applicant must meet in order to satisfy the word "customary."

## II

Having concluded that if the plaintiff met the eleven specific requirements of § 7.1 (b) (2) (a) of the regulations, she was entitled to have her application granted, we turn to whether there was substantial evidence in

the record that her application failed to comply with any of those requirements. The trial court concluded that because the plaintiff admittedly was not operating the entirety of her transportation business from her home, it was reasonable for the board to conclude that she was not in compliance with § 7.1 (b) (2) (a) (1). Section 7.1 (b) (2) (a) (1) of the regulations provides: "A customary home occupation shall be carried on entirely within the dwelling unit or within a completely enclosed permitted accessory building on the same lot as the dwelling unit." Carey and the board concluded that this provision means that the home occupation cannot be part of a larger enterprise that is conducted off-site. The court agreed with this interpretation.

The plaintiff claims that the court improperly upheld the board's conclusion that the determining factor of whether a specific customary home occupation is allowed under the regulations is by a consideration of the nature of the business to which the home occupation relates and whether any part of that business is conducted off-site. The plaintiff argues that the plain language of § 7.1 (b) (2) (a) (1) of the regulations should be construed "as simply protecting the residential character [of] the neighborhood by requiring that all home occupation related activities on the property be confined to within a building and not conducted outside in the yard." Consequently, the plaintiff argues that she could be in violation of that requirement only if she was conducting her home occupation partly in her yard or in some other area on her property. We agree with the plaintiff.

As stated previously in this opinion: "[T]he interpretation of provisions [of a municipal zoning regulation] is . . . a question of law for the court. . . . The court is not bound by the legal interpretation of the [regulation] by the [board]." (Internal quotation marks omitted.) *Lowney* v. *Zoning Board of Appeals*, supra, 144 Conn. App. 229. "Since zoning regulations are in derogation of common law property rights . . . the regulation cannot be construed beyond the fair import of its language to include or exclude by implication that which is not clearly within its express terms. . . . The words employed by the local legislative body are to be interpreted in accordance with their natural and usual meaning . . . and any interpretation that would torture the ordinary meaning of the words to create ambiguity will be rejected. . . . Common sense must be used in construing the regulation, and we assume that a rational and reasonable result was intended by the local legislative body." (Citations omitted.) *Spero* v. *Zoning Board of Appeals*, 217 Conn. 435, 441, 586 A.2d 590 (1991).

In this case, § 7.1 (b) (2) (a) (1) of the regulations specifically provides that "[a] customary home occupation shall be carried on entirely within the dwelling unit or within a completely enclosed permitted accessory

building on the same lot as the dwelling unit." The wording of this regulation is clear. The occupation being conducted at the residence must take place either inside of the residence or in an enclosed approved accessory building on the premises. The occupation, therefore, is not allowed to spill over into the yard, the street, or an unapproved structure or vehicle in the yard.

Furthermore, § 7.1 (b) (2) (a) (1) of the regulations cannot be read in isolation but must be read in context with rest of § 7.1 (b) (2) (a). All of the requirements of that section make clear that the section regulates conduct on the property and how and where it is conducted. Subdivision (1) clearly regulates where on the property the home occupation may take place, just as subdivision (2) regulates who may engage in the home occupation on the property. Had the town intended the interpretation suggested by the board and adopted by the court, subdivision (1) would provide that all business activity associated with a home occupation shall be carried on entirely *on the property*, as opposed to requiring only that the home occupation itself take place entirely *within the dwelling unit or an enclosed permitted accessory building* on the property. Carey's and the board's interpretation of subdivision (1) simply is not reasonable given the express language of the subdivision, particularly when read in the context of the entire section. We conclude that there is nothing in the plain language of the regulation that prohibits a home occupation that is part of a larger enterprise located off-site.

Moreover, the board's interpretation would lead to arbitrary outcomes. For example, the board's interpretation, as more fully explained by its attorney during oral argument before this court, would mean that a solo practitioner law firm operated from a residence would be a permitted home occupation, but a lawyer who works from home by telecommuting to a firm in Hartford would not be a permitted home occupation.

Presumably, this would be true even if the attorney who operated an entire practice from her home regularly left to go to court or visit clients, even though that would mean her occupation was not conducted entirely on her property. Furthermore, the operation of a law office from one's home, which could include signage and clients coming and going, is more likely to impact the residential character of the neighborhood than would a single attorney anonymously working in her home by telecommuting to her law firm. Similarly, a computer web designer, if found "customary"; but see part I of this opinion; would be allowed under § 7.1 (b) (2) (a) (1) of the regulations, but only if he or she was not telecommuting as part of a larger web design firm, despite the fact that the impact on the residential character of the neighborhood likely would be exactly the same under both scenarios. We disagree that the town

intended such a nonsensical interpretation of § 7.1 (b) (2) (a) (1) of the regulations. In fact, allowing customary home occupation to be defined under such a test runs contrary to the detailed specific standards set forth in § 7.1 (b) (2) (a), by which the town determined that home occupations are to be judged.

It is undisputed that the plaintiff's application contemplated that her entire home occupation would take place within her dwelling and not outside on her property. Consequently, the board had no evidence on which to deny her application for failing to comply with § 7.1 (b) (2) (a) (1) of the regulations. For the same reason, the court erred in concluding that the board acted reasonably in denying the plaintiff's application simply because her home occupation is part of a larger business that takes place off-site.[7]

The judgment is reversed and the case is remanded to the Superior Court with direction to render judgment sustaining the plaintiff's appeal and directing the board to approve her application for a customary home occupation under reasonable terms and conditions that are in accordance with its regulations.

In this opinion the other judges concurred.

[1] Section 7.1 of regulations neither sets forth a specific requirement that a person seek approval or seek a permit for an customary home occupation, nor does it contain any direction for obtaining such approval or permit. It also appears that the town has no formal application for someone to fill out. The final subdivision of § 7.1 of the regulations, specifically § 7.1 (b) (2) (a) (12), however, sets forth the following: "The Building Official may, at his discretion, for good cause such as a noncustomary use, potential excessive noise, storage of materials or parking, [refer] any question concerning a customary home occupation to the Town Plan and Zoning Commission for its review and recommendations. The Town Plan and Zoning Commission shall have thirty (30) days from its receipt of the application from the Building Official within which to forward its report of findings and recommendations to the Building Official. Said report of the Town Plan and Zoning Commission shall be advisory only, and the failure of the Town Plan and Zoning Commission to submit its report within the prescribed thirty (30) day period shall not prevent the Building Official from reaching a decision *on the application for the customary home occupation* after the prescribed thirty (30) day time period has expired." (Emphasis added.) There is no indication in the record that Carey, the building official, referred this matter to the Town Plan and Zoning Commission.

Whether the regulations legally required the plaintiff to submit an application for her home office need not be determined in this appeal because the parties agreed that the plaintiff would submit such an application.

[2] The plaintiff's attorney sent a letter to the board on January 29, 2016, withdrawing the plaintiff's appeal to the board. The board, unaware of this letter, on February 1, 2016, voted to deny the plaintiff's appeal of the cease and desist order. The transcript of the April 4, 2016 hearing reveals that this letter was not seen by the board's chairperson prior to April 4, 2016.

[3] The frustration of some of the members also may have been due, at least in part, to the fact that they did not understand that the plaintiff had withdrawn her appeal from the cease and desist order and was proceeding on a completely new application.

[4] Although Carey was not asked about the basis for the conclusion in his denial letter that the plaintiff's business violated § 7.1 (b) (2) (a) (8) of the regulations, which requires that a customary home occupation "shall not create any objectionable noise, odor, vibrations or unsightly conditions," his letter rejecting the plaintiff's application stated that his conclusion was based on "complaints and testimony of past practices."

[5] There had been evidence submitted to the board that GPS tracking devices have been installed on all of the business vans.

⁶ Although the propriety of nonseated and nonvoting alternate members participating in the deliberations of the board is not raised as an issue in the present case, we note that such participation, after the close of the public hearing, is improper. See *Komody* v. *Zoning Board of Appeals*, 127 Conn. App. 669, 686, 16 A.3d 741 (2011) (alternate members of board, who are nonseated and nonvoting for purposes of matter under board's consideration, may participate fully in public hearing; those same alternate members, however, may not participate in board's discussion after close of public hearing).

⁷ The board also argues in a footnote in its appellate brief that "the record provides substantial evidence from which the [board] and this court may conclude that [the plaintiff] did not satisfy [subdivisions] [3 and 4] of § 7.1 (b) (2) (a) . . . ." Subdivision (3) provides that "[a] customary home occupation shall be clearly incidental and secondary to the use of such dwelling unit and lot for residential purposes." Subdivision (4) provides that "[a] customary home occupation shall not change the residential character of such dwelling unit and lot." We are not persuaded by this argument.

As to subdivision (3), neither Carey nor the board ever claimed that the plaintiff was in violation of that section. Nor did the trial court make any reference to subdivision (3) when it affirmed the board. Furthermore, the board does not identify any evidence in the record to support a conclusion that the plaintiff's operation of a home office was anything but incidental and secondary to the plaintiff using her home as the primary residence of her and her family. With respect to subdivision (4), Carey made clear that the basis for his finding that the plaintiff's application violated that subdivision was the plaintiff's past practices that had been the subject of the earlier cease and desist order. We agree with the court that past activities of the plaintiff do not provide substantial evidence to deny the plaintiff's application moving forward. With respect to the application itself, there was no evidence before the board that operating a home office entirely within the plaintiff's dwelling would change the residential character of her dwelling or lot.

————————————————————